# N THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs August 2, 2005

## STATE OF TENNESSEE v. MICHAEL NASH

**Appeal from the Criminal Court for Shelby County**
**No. 03-03621     Otis Higgs, Judge**

---

**No. W2004-03005-CCA-R3-CD - Filed September 6, 2005**

---

The Defendant, Michael Nash, was convicted by a jury of one count of aggravated robbery. After a hearing, the trial court sentenced him as a Range II, multiple offender to twelve years in the Department of Correction. In this appeal as of right, the Defendant challenges the sufficiency of the evidence and contends that he should have been sentenced as a Range I, standard offender. We affirm the Defendant's conviction. We reverse the order of the trial court sentencing the Defendant as a Range II, multiple offender. We remand this matter for a new sentencing hearing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

Tony Brayton, Assistant Public Defender, Memphis, Tennessee, for the appellant, Michael Nash.

Paul G. Summers, Attorney General & Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Tom Hoover, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Tamro Lewis testified that on the evening of Friday, October 19, 2001, she was working at Lauderdale Liquors in Shelby County, Tennessee. The liquor store was configured such that the area containing the liquor and the cash registers was separated by bulletproof glass from the lobby in which the customers arrived. The employees worked behind the glass. A single closed door separated the two areas. Normally, a customer would enter the lobby, tell an employee what he or she wanted, and then pay for the item through a drawer between the lobby and the employee area. The liquor bottle would then be placed in a "chute" and delivered to the customer. Customers were not allowed in the area in which the employees worked. According to Ms. Lewis, the store also

cashed checks. For this purpose, there was a cash box kept in the drawer of a file cabinet in an area behind the display shelves.

Ms. Lewis testified that, on the night in question, a black man entered the store and purchased a large bottle of Moet champagne for about $83. Ms. Lewis did not recognize the man and stated that he was not one of her regular customers. About twenty minutes later, the man returned and wanted to exchange the bottle of Moet for several less expensive bottles. Ms. Lewis called her employer and sought permission to make the exchange. Upon getting approval, Ms. Lewis and her co-worker began putting the less expensive bottles of champagne into a box in preparation for the exchange. When the box was ready, they waited for the lobby to clear of additional customers. Ms. Lewis's co-worker, John Harmon, then opened the door between the lobby and the employee area in order to pass the box to the customer wanting the exchange. Ms. Lewis identified this customer at trial as the Defendant.

Ms. Lewis stated that, instead of taking the box, the Defendant pulled out a gun and came through the door into the employee area. A second man followed him in. The Defendant approached Ms. Lewis and asked her where "the box" was. Ms. Lewis realized that the Defendant was seeking the cash box from which the business cashed checks. Ms. Lewis stated that the existence of "the box" was common knowledge among regular customers. She also stated that, at times, it was in plain view from the lobby area.

The Defendant pulled open the drawers of the filing cabinet kept in the back area and found the box. The second man then came to the Defendant and took the gun. The second man returned to the area where Mr. Harmon was located and some altercation occurred. The two men then left the store and Ms. Lewis called the police.

Ms. Lewis explained that, after the robbery, she viewed some photographs compiled by the police but was not able to identify from the photographs the man who had pulled the gun and retrieved the cash box. However, she was certain at trial that the Defendant was that man.

Ms. Lewis also explained that the store had a video camera for security purposes. She identified a video tape that was made during the time of the robbery. This tape was played for the jury. Ms. Lewis acknowledged that she never saw a clear view of the robber's face on the video tape.

Michael Dickerson testified that, on the evening of October 19, 2001, he was a customer at Lauderdale Liquors. While he was there, he noticed another man who was placing an unusual order of "different liqueurs." Mr. Dickerson identified the Defendant at trial as this other customer. Mr. Dickerson left the store before the robbery occurred.

John Harmon testified that he was working at Lauderdale Liquors on the night of the robbery. At about 7:30 that evening, he stated, a customer came in and wanted a large bottle of champagne. Mr. Harmon sold him a bottle of Moet for $82. About two hours later, the customer returned and

stated that he had "bought the wrong thing." The customer, whom Mr. Harmon identified at trial as the Defendant, wanted to exchange the single bottle for multiple less expensive bottles of champagne. Mr. Harmon and Ms. Lewis then collected numerous bottles of less expensive champagne. Mr. Harmon stated that all of the cheaper bottles made up two boxes.

Mr. Harmon passed one of the boxes to the Defendant through the door between the lobby and the employee area. The Defendant took this box out to his car and then returned for the second box. Mr. Harmon testified that, as he started to pass the second box through the door, the Defendant "pulled a gun up and said I'm coming in." Mr. Harmon described the gun as an automatic, "a 9 or either a .380."

Upon being faced with the gun, Mr. Harmon dropped the second case of champagne and stepped back. The Defendant approached the front of the register and told Mr. Harmon to get down on the floor. Mr. Harmon then saw a second man come into the store behind the Defendant. The Defendant asked where "the box" was. Mr. Harmon assumed the Defendant was referring to the cash box. The Defendant then handed his gun to the second man and told that person to make sure Mr. Harmon did not move. The Defendant went to the back area of the store and returned with the cash box. The Defendant had also retrieved the unloaded handgun that was kept in the back area of the store. The second man took the money out of one of the cash registers and the two men then left the store. Mr. Harmon stated that the robbery lasted three to four minutes. He also stated that the robbery made him "scared."

Mr. Harmon testified that he had never seen the Defendant before. He was able to identify the Defendant's photograph on November 2, 2001, from a line-up showed to him by the police.

Mike DeAngelis testified that he is the owner of Lauderdale Liquors. He explained that the check cashing aspect of his business is heaviest on paydays, and that he would expect to have $50,000 to $60,000 dollars at the store for that purpose on a Friday. Most of that money was kept in a floor safe to which only he had access. Some of the cash was kept in a cash box to which the employees had access.

Mr. DeAngelis had worked in the store on the day of the robbery but left at about 4:30 or 5:00 that afternoon. He heard about the robbery about ten minutes after it happened. Mr. DeAngelis performed an audit after the robbery and determined that about $22,000 was missing as well as the pistol he kept at the store.

During cross-examination, Mr. DeAngelis asserted that he thought either Ms. Lewis or Mr. Harmon was involved with the robbery. He further stated that, to his knowledge, the police had not pursued that possibility. Mr. DeAngelis confirmed that he had spoken with Ms. Lewis over the phone that night, but the conversation was limited to a discussion about a discount on a case of champagne. Mr. DeAngelis stated that an exchange of one bottle of champagne for others would have been "a problem" and contrary to store policy. He also stated that opening the door between the lobby and the employee area was a breach of his security procedures.

Memphis Police Sergeant James Howell testified that he investigated the robbery of Lauderdale Liquors. During his investigation, the Defendant's name was developed as a suspect. Accordingly, Sgt. Howell developed photographic line-ups to show Ms. Lewis and Mr. Harmon. Ms. Lewis was not able to provide a positive identification on the basis of these line-ups. Mr. Harmon, however, did positively identify the Defendant's photograph from one of the line-ups. Sgt. Howell testified that he showed Mr. Harmon a total of three line-ups, only one of which contained a photograph of the Defendant.

Sgt. Howell also stated that crime scene officers had obtained some partial fingerprints from the liquor store, but none of these were matched to the Defendant. Sgt. Howell further stated that he had reviewed the video tape of the robbery but could not positively identify anyone's face from the tape.

The Defendant testified and explained that he remembered the 19th of October because his birthday was "coming up that Sunday." He spent the day making arrangements to get his car fixed and was on LeCleaves and Walker street at his cousin's house getting his car repaired during the time of the robbery.

The Defendant acknowledged that he had been previously convicted of a felony drug charge, a bank robbery and a gun offense. The Defendant maintained, however, that he "did not rob that liquor store."

After considering the above proof, the jury convicted the Defendant of the aggravated robbery of John Harmon by use of a handgun and placing the victim in fear.

## ANALYSIS

### I. Sufficiency of the Evidence

In his first issue, the Defendant contends that the evidence is not sufficient to sustain his conviction. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's

witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Aggravated robbery is defined as the "intentional or knowing theft of property from the person of another by violence or putting the person in fear," Tenn. Code Ann. § 39-13-401(a), "[a]ccomplished with a deadly weapon . . . ." Id. § 39-13-402(a)(1). In this case, the proof established that the Defendant, using a handgun, gained entrance into the employee area of Lauderdale Liquors and took the business's cash box. The Defendant took possession of the money after accosting John Harmon with the gun and ordering him onto the floor. Mr. Harmon testified that he was scared during the robbery.

Two eyewitnesses to the robbery identified the Defendant at trial as the perpetrator. One of these eyewitnesses also identified the Defendant as the perpetrator from a photographic line-up about two weeks after the robbery.

This proof is sufficient to support the Defendant's conviction. The Defendant challenges the credibility of the eyewitnesses, but such determinations are left to the jury and will not be second-guessed by this Court. The Defendant's contention that the evidence is not sufficient is without merit. We affirm the Defendant's conviction.

## II. Sentencing

The Defendant also argues that the trial court erred in determining him to be a Range II, multiple offender and therefore subject to a longer sentence than if he were sentenced as a Range I, standard offender.[1] The State responds that the Defendant has waived this issue by not raising the issue at the sentencing hearing and by failing to raise it in his motion for new trial. In his Amended Motion for New Trial, the Defendant requested a new trial on the basis that, among other things, "[t]he Court erred in sentencing Defendant to 12 years @ 35% consecutive to Defendant's federal sentence." The State argues that the Defendant "only objected to the imposition of consecutive sentencing, where the trial court ran the [D]efendant's sentence consecutive to his federal sentences." We disagree. The statement of the issue, although not succinct, was sufficient to preserve the issue of the length of the Defendant's sentence as well as the trial court's determination that it was to be served consecutively. If the Defendant had intended to challenge only the consecutive nature of his sentence, the reference to its length was unnecessary. Accordingly, we will address on its merits the Defendant's issue regarding the length of his sentence.

---

[1]Criminal defendants classified as "Range I" offenders are subject to shorter sentences than those classified as "Range II" offenders. See Tenn. Code Ann. § 40-35-112(a), (b).

The Criminal Sentencing Reform Act of 1989 defines a "multiple offender" as a defendant who has received:

(1) A minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower felony classes, where applicable; or

(2) One (1) Class A prior felony conviction if the defendant's conviction offense is a Class A or B felony.

(b) In determining the number of prior convictions a defendant has received:

(1) "Prior conviction" means a conviction for an offense occurring prior to the commission of the offense for which the defendant is being sentenced[.]

Tenn. Code Ann. § 40-35-106. "A defendant who is found by the court beyond a reasonable doubt to be a multiple offender shall receive a sentence within Range II." Id. § 40-35-106(c). Our supreme court has held that, within this context, "'prior conviction' means a conviction that has been adjudicated prior to the commission of the more recent offense for which sentence is to be imposed." State v. Blouvett, 904 S.W.2d 111, 113 (Tenn. 1995) (emphasis added).

The Defendant committed the instant crime on October 19, 2001. Aggravated robbery is a Class B felony. See Tenn. Code Ann. § 39-13-402(b). The Defendant was convicted of a federal felony drug charge in 1992. However, there is no proof in the record that the Defendant's 1992 conviction is a Class A felony.[2] Thus, the Defendant cannot be classified as a multiple offender subject to a Range II sentence on the basis of this single prior conviction. The Defendant was also convicted of federal charges in 2003. However, these convictions were adjudicated after the instant crime was committed and therefore do not satisfy the definition of "prior convictions." Thus, they cannot be used to classify the Defendant as a multiple offender. Accordingly, the proof in the record is insufficient to sustain the trial court's determination that the Defendant is a multiple offender subject to Range II sentencing for the purposes of the instant conviction. Therefore, we must modify the Defendant's sentence by designating him to be a standard offender subject to a Range I sentence for the purposes of the aggravated robbery conviction in this case. See id. § 40-35-105. The Range I sentence for a Class B felony is eight to twelve years. See id. § 40-35-112(a)(2).

At the time the Defendant's sentencing hearing was held, the trial court, prosecutor and defense counsel were in agreement that the United States Supreme Court case of Blakely v. Washington, 542 U.S. 296 (2004), prohibited the application of enhancement factors to the Defendant's sentence for the instant crime, other than prior convictions. Thus, no proof was submitted as to whether the Defendant's sentence could be properly increased beyond the presumptive sentence.[3] The Tennessee Supreme Court has since determined that Blakely does not apply to Tennessee's sentencing scheme. See State v. Gomez, 163 S.W.3d 632, 661 (Tenn. 2005).

---

[2]Indeed, the State's Amended Notice of Intent to Seek Enhanced Punishment provides that the Defendant's 1992 conviction is a Class B felony.

[3]The Sentencing Act provides that the presumptive sentence for a Class B felony, absent enhancement or mitigating factors, is the minimum in the applicable range. See Tenn. Code Ann. § 40-35-210(c).

Thus, the Defendant's sentence may be increased beyond the presumptive sentence of eight years to a maximum of twelve years upon the proper application of enhancement and mitigating factors. See Tenn. Code Ann. § 40-35-210(e). In order for the trial court to determine whether any enhancement (or mitigating) factors should be applied and the Defendant's presumptive sentence increased, a second sentencing hearing is necessary.

Accordingly, we modify the Defendant's sentence insofar as changing his designation from a Range II, multiple offender to a Range I, standard offender as to the instant offense of aggravated robbery. We remand this matter for a new sentencing hearing for the presentation of proof as to any enhancement and mitigating factors that may be applicable, and the trial court's analysis thereof. The trial court shall thereupon enter an amended judgment setting forth the Defendant's revised sentence.

## CONCLUSION

We affirm the Defendant's conviction of aggravated robbery. We reverse the trial court's determination that the Defendant be sentenced as a Range II, multiple offender and we modify the Defendant's sentence so as to designate his sentencing classification as a Range I, standard offender. We remand this matter for a new sentencing hearing consistent with this opinion.

_____
DAVID H. WELLES, JUDGE